UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| AMYA SPARGER-WITHERS on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:21-cv-02824-JRS-CSW |
| JOSHUA N. TAYLOR, et al., | ) ) ) | |
| Defendants. | ) | |

**Order on Motions for Summary Judgment**

This is a class action civil rights case that presents a single legal question: does Indiana's system of contingency-fee civil forfeiture prosecution violate due process? The Court denied a mootness challenge and certified a class of plaintiffs who are subject to such prosecutions.  (ECF No. 88.)  Now before the Court are the Parties' cross motions for summary judgment on the legal question.  (ECF Nos. 120 (Plaintiff), 126 (Defendants).)

## I.    Legal Standard

The legal standard on summary judgment is well established:

> Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Skiba* [*v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018)] (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 [] (1986)). A theory "too divorced from the factual record" does not create a genuine issue of material fact. *Id.* at 721. "Although we construe all facts and make all reasonable inferences in the nonmoving party's favor, the moving party may succeed by showing an absence of evidence to support the non-moving party's claims." *Tyburski v. City of Chicago*, 964 F.3d 590, 597 (7th Cir. 2020).

*Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 718 (7th Cir. 2021).  The Court applies that standard here.

## II.   Discussion

### A. Overview

The Court assumes familiarity with the operative facts, which are set forth in greater detail in its Order on Motion to Dismiss, (ECF No. 88), and the Parties' briefs on summary judgment, (ECF Nos. 121, 128).  In short, Indiana, alone among the fifty states, allows private attorneys to prosecute civil forfeitures on a contingency fee basis.  The Institute for Justice ("IFJ"), the civil-libertarian public interest group serving as class counsel here, argues that arrangement violates due process.

This case should be easy: Indiana's law, while out of step with modern policy consensus, is in line with early American practice and indistinguishable from that other atavism, the *qui tam* action, which has been held constitutional.  Note: *The History and Development of Qui Tam*, 1972 Wash. U. L.Q. 81, 97–100 (1972) (describing early ubiquity and slow decline of the *qui tam* action); Note: *Private Prosecution: a Remedy for District Attorneys' Unwarranted Inaction*, 65 Yale L.J. 209, 222 (1955) (surveying jurisdictions and noting, as of 1955, twenty-one states and the federal government with private contingency enforcement of criminal laws); *see also, e.g.*, *Rotella v. Wood*, 528 U.S. 549, 557 (2000) (explaining RICO "private attorney general" scheme with treble damages to motivate private enforcement).  Long before there was a public prosecutor, or even a clear divide between civil and criminal actions, states provided for law enforcement by informers working for reward.  *United*

*States v. UCB, Inc.*, 970 F.3d 835, 839 (7th Cir. 2020) (quoting *Adams v. Woods*, 6 U.S. (2 Cranch) 336, 341 (1805)) ("Suits of this type were once so common that '[a]lmost every' penal statute could be enforced by them."). The historic irony here is that civil libertarians in previous centuries preferred that old model to the new one, which IFJ would have the Court force Indiana to adopt. The Court, not being a legislature and having no proper role in policy debates, should be able to leave Indiana to its own devices where long historic practice gives its imprimatur. *Accord Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 39 (1991) (Scalia, J., concurring) (tracing the development of due process jurisprudence) ("In my view, it is not for the Members of this Court to decide from time to time whether a process approved by the legal traditions of our people is 'due' process, nor do I believe such a rootless analysis to be dictated by our precedents."). But some confusion in the caselaw makes this case more difficult than it ought to be in principle.

B. Supreme Court Precedent

IFJ thinks there is controlling Supreme Court precedent. It rests its case on *Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980), which, it contends, establishes a "financial disinterestedness requirement on prosecutors." (Pl.'s Br. Supp. 8, ECF No. 121.) It is worth risking tedium by walking through that decision in detail.

In *Marshall*, the Supreme Court was asked to decide whether a provision of the Fair Labor Standards Act violated the due process clause by allowing civil penalties assessed by the Department of Labor to be paid to the Department of Labor. *Id.* at 239. The Court held it did not. *Id.* at 242.

The Court began its discussion by declaring, "[t]he Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." *Id.* The Court noted that it "jealously guarded" the requirement for a neutral tribunal, and cited *Tumey v. Ohio*, 273 U.S. 510 (1927), and *Ward v. Village of Monroeville*, 409 U.S. 57 (1972), as examples of cases in which the Court demanded perfect financial disinterestedness from judges. *Marshall*, 446 U.S. at 242. But where the District Court had applied those cases to invalidate the civil penalty scheme at issue, the Supreme Court reversed, explaining that "[t]he rigid requirements of *Tumey* and *Ward*, designed for officials performing judicial or quasi-judicial functions, are not applicable to those acting in a prosecutorial or plaintiff-like capacity." *Id.* at 248. The Court reasoned that "[p]rosecutors need not be entirely 'neutral and detached,'" because, "[i]n an adversary system, they are necessarily permitted to be zealous in their enforcement of the law." *Id.* (quoting *Ward*, 409 U.S. at 62). The Court quoted *Tumey* for the proposition that states "may, and often ought to, stimulate prosecutions for crime by offering to those who shall initiate and carry on such prosecutions rewards for thus acting in the interest of the state and the people." *Id.* at 249 (quoting *Tumey*, 273 U.S. at 535).

In the next paragraph, though, the Court cautioned there were still some limits on acceptable prosecutorial behavior. *Id.* ("We do not suggest . . . that the Due Process Clause imposes no limits on the partisanship of administrative prosecutors."). The Court noted that "prosecutors are public officials" with a duty to "the public interest," *id.* (citing *Berger v. United States*, 295 U.S. 78, 88 (1935)); that "enforcement decisions

of an administrator" were not "immunize[d] from judicial scrutiny," *id.*; and that "[a] scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions," *id.* at 249–50 (citing *Bordenkircher v. Hayes*, 434 U.S. 357, 365 (1978) and 28 U.S.C. § 528).  After noting those outer bounds, the Court concluded, "[b]ut the strict requirements of neutrality cannot be the same for administrative prosecutors as for judges, whose duty it is to make the final decision and whose impartiality serves as the ultimate guarantee of a fair and meaningful proceeding in our constitutional regime."  *Id.* at 250.

The Court did not sharpen its definition of the outer bounds in its application of the law to the facts.  It simply observed, "[i]n this case, we need not say with precision what limits there may be on a financial or personal interest of one who performs a prosecutorial function, for here the influence alleged to impose bias is exceptionally remote."  *Id.*  An apophatic footnote adds, "[i]n particular, we need not say whether different considerations might be held to apply if the alleged biasing influence contributed to prosecutions against particular persons, rather than to a general zealousness in the enforcement process."  *Id.* at 250 n.12.  Another adds, "[w]e need not, of course, say whether the alleged biasing influence is to[o] remote to raise constitutional objections even under the standards of *Ward* and *Tumey*."  *Id.* at 252 n.14.  In the body of its discussion, the Court reasoned that on the facts before it (1) "[n]o governmental official stands to profit economically from vigorous enforcement," *id.* at 250; (2) the penalties were such a small portion of the agency budget that "the

5

prospect of institutional gain" was low, *id.*; and (3) the penalties were not guaranteed to return to the specific office that won them, *id.* The Court also thought that "under a realistic appraisal of psychological tendencies and human weakness," *id.* at 252 (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)), no agency prosecutor's "enforcement decisions would be distorted" by the possibility of financial gain, *id.*

This Court reads *Marshall* to be a straightforward application of then-existing law to an easy set of facts. It is a not a landmark case—it seems to have no pretensions to be—and the Court thinks it unwise to read its various observations as overturning old law *sub silentio* or establishing new principles.

On the Court's reading, *Marshall* is faithful to precedent. The District Court there applied a strict disinterestedness requirement to an administrative prosecutor; the Supreme Court corrected it: strict disinterestedness is not required of prosecutors. *Id.* at 248–49. That is the heart of the legal discussion in Section II.A, and that was enough to resolve the case. If the opinion stopped there, of course, IFJ would have no help from it: the *Marshall* Court explicitly distinguished judges, who must be financially neutral, from prosecutors, who need not. And in case that were not clear enough, the Court cited with apparent approval its earlier precedent wholeheartedly endorsing private prosecution on contingency. *Id.* at 249 (quoting *Tumey*, 273 U.S. at 535). The Court, as it happens, did not leave off there, and IFJ understands the remainder of its discussion to undercut the dispositive portion. That is a misreading. *Cf. U.S. ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 759 (9th Cir. 1993) (describing as "exaggerated" the argument that *Marshall* "strongly suggested" a financial

disinterestedness requirement for prosecutors).  The *Marshall* Court did not stop at its quote approving the state's power to "stimulate prosecutions" with financial incentives, *id.*, because to have done so would have invited later problems—problems, ironically, that would spring from overreading a shorter decision.

So, for instance, the Court did not want its decision to be read to repudiate existing law on judicial review of administrative enforcement decisions.  Thus it reserved its power to review enforcement decisions, and cited administrative law cases where it had done so.  *Id.* (citing *Dunlop v. Bachowski*, 421 U.S. 560, 567, n.7 (1975) and *Rochester Telephone Corp. v. United States*, 307 U.S. 125 (1939)).  Nor did the Court want to disclaim existing law setting constitutional limits on prosecutors' discrimination along "unjustifiable standard[s] such as race, religion, or other arbitrary classification." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).  Thus it reserved the possibility that some arrangements "may" be unconstitutional. *Marshall*, 446 U.S. at 250; *contra Brucker v. City of Doraville*, 38 F.4th 876, 886 (11th Cir. 2022) (quoting *Marshall*, 446 U.S. at 249–50) (amending "may . . . raise serious constitutional questions" to "raise[s] serious constitutional questions" and analyzing facts accordingly).  And it cited the rule against federal prosecutors' financial conflicts to reinforce its earlier observation that public officials are limited (at least by statute) in their partisanship.  *Id.* (citing 28 U.S.C. § 528); *cf. Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 633 n.10 (1989) (noting in a Sixth Amendment hypothetical, "[t]he fact that a federal statutory scheme authorizing [criminal] contingency fees . . . is at odds with model disciplinary rules or state disciplinary

codes hardly renders the federal statute [constitutionally] invalid."). But those are defensive moves; the Court was not announcing new rules. The Court makes that clear when it returns, in summation, to its original proposition: "the strict requirements of neutrality cannot be the same for administrative prosecutors as for judges" because impartial judges, not impartial prosecutors, are the guarantors of a fair adversarial proceeding. *Id*.

The Court in Section II.B continues in its modest, defensive posture. The Court refuses to announce a general rule on prosecutorial self-interest. *Id*. Its footnote suggests any rule it might have made would concern "prosecutions against particular persons"—perhaps the protected classes alluded to in *Bordenkircher*—rather than "a general zealousness in the enforcement process"—perhaps like the structural incentives of contingency-fee prosecution at issue here. *Id*. n.12. But that must be speculation: the Court did not announce a rule. The Court then shows how harmless the financial incentives are on the facts presented. IFJ wants to read the factors it considers—like the "financial dependen[ce]" *vel non* of an official on penalties or the "realistic possibility" of distortion in prosecutorial judgment, *id*. at 250–51—as establishing rules for this Court's analysis, (Pl.'s Br. Supp. 23, ECF No. 121). But the *Marshall* Court does not refer to those factors in order to establish new rules (which would, after all, contradict its exposition of the law earlier in the opinion); it uses the factors to show that there is not a due process violation and to suggest that there might not even be a violation under the more stringent "judicial" requirements of *Ward* and *Tumey*. *Marshall*, 446 U.S. at 252 n.14. The Court's quotation from

*Withrow v. Larkin*, 421 U.S. 35 (1975), reinforces that play: *Withrow* held that agency officials may simultaneously serve as prosecutors and judges, so long as a "realistic appraisal" of psychology suggests no motive for bias. *Withrow*, 421 U.S. at 47. When the *Marshall* Court imports the *Withrow* standard, it is, as with its references to *Ward* and *Tumey*, showing that the challenged scheme, so far from being impermissible under its Section II.A standard, might be permissible even under a much more stringent standard.

What, then, does *Marshall* do for this case? The Supreme Court there affirmed that prosecutors need not be neutral like judges; it quoted, without overturning, precedent allowing, even commending, contingency-fee private prosecution; and it suggested that some prosecutorial misbehavior could be unconstitutional without saying what. At one interpretive extreme, *Marshall* resolves the case: *Tumey* says contingency-fee private prosecution is allowed, *Marshall* did not touch that line of precedent, it stands as controlling law, and so IFJ cannot carry its burden of showing Indiana's scheme unconstitutional. *Tumey*, 273 U.S. at 535 (citing *United States v. Murphy & Morgan*, 41 U.S. 203 (1842)) ("The Legislature may offer rewards or a percentage of the recovery to informers."). That would be quite the backfire for IFJ. At the other end of the interpretive spectrum, *Marshall* does nothing at all: it says financially interested prosecutors might violate due process, implicitly limiting *Tumey* and its forebears, but, refusing to give any rule, throws future courts back onto general due process principles. *See, e.g., United States v. Lovasco*, 431 U.S. 783, 796–97 (1977) (admitting, in case of prosecutorial delay, some outer bound to due

process, but leaving "lower court[s]" to apply "the settled principles of due process" to determine where exactly the boundary lies). This, too, would not favor IFJ with a bright line rule, but instead would require an ad hoc review of each case.

This Court, if forced to choose, favors the first option: *Marshall* probably intended to leave *Tumey* untouched, because, had it wished to disavow *Tumey*, it would have done so explicitly, and it did not. That choice would minimally resolve this case. The Court will not rest there because the contrary argument has some merit: why would the *Marshall* Court say that some financial interests could "raise serious constitutional questions" if it believed that continency-fee private prosecutions were acceptable? *Marshall*, 446 U.S. at 250. It is hard to imagine a financial interest more direct than that. There are ways to rebut that argument—namely, as this Court has endeavored above, to point out that the *Marshall* Court's general catch-all statement that there *might* be an outer limit should not be taken as an affirmative statement that such a limit *does* exist and overrules precedent. (Alternately, one could read the *Marshall* Court to have implicitly distinguished between the private prosecutors mentioned in *Tumey* and the "public officials," "administrator[s]," and "administrative prosecutors" it deals with in its limiting statements. *Id.* at 249–50. Perhaps the Court thought that public prosecutors were subject to different standards.) To reinforce its judgment, though, this Court thinks it worthwhile to proceed on a hypothetical: as if it is wrong about *Marshall*, such that *Marshall* does abrogate earlier cases and does establish an unspecified "financial disinterestedness" requirement for prosecutors. That means turning to general due process analysis.

C.  Due Process Standard

A threshold issue in the general analysis, not fully addressed by either party in its briefing, is which standard the Court should apply to decide whether Indiana's law comports with "due process," which words, standing alone, have been called "cryptic and abstract." *Dusenbery v. United States*, 534 U.S. 161, 167 (2002) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)).  It is an unsettled question.  *See generally* Wayne R. LaFave, Jerod H. Israel, Nancy J. King, & Orin S. Kerr, 1 Crim. Proc. § 2.7(c) (4th ed.) (2023) (explaining ongoing debate between historicist and interest-balancing approaches).  Sometimes the Supreme Court has endorsed a historical approach to determining the content of "due process," which looks to "settled tradition," "historical practice," and "our common-law heritage" to determine constitutionality.  *Medina v. California*, 505 U.S. 437, 444–46 (1992) (citing *Patterson v. New York*, 432 U.S. 197, 202 (1977) and *Martin v. Ohio*, 480 U.S. 228, 232 (1987)).  Elsewhere the Supreme Court applies an interest balancing test that calls on the courts' intuitions of fairness.  *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

The Supreme Court recently said that *Medina*'s historical approach should be used for "state procedural rules that are part of the criminal process," while *Mathews*' interest-balancing approach applies, apparently, everywhere else.  *Nelson v. Colorado*, 581 U.S. 128, 134 (2017) (citing *Kaley v. United States*, 571 U.S. 320, 351 n.4 (2014) (Roberts, C.J., dissenting)).  This Court is not certain how broadly to read that statement, which, if taken as absolute, would bifurcate due process

jurisprudence according to whether the challenged rule was categorized as "criminal" or "not criminal."  That result, without regard to its underlying merits or defects, seems extreme and might be unintentional given the lack of discussion with which it is accompanied.  The Supreme Court had previously "decline[d] . . . to define the respective reach of *Mathews* and *Medina*," *Kaley*, 571 U.S. at 334, and had explicitly rejected *Mathews*' general applicability, *Dusenbery*, 534 U.S. at 168 ("[W]e have never viewed *Mathews* as announcing an all-embracing test for deciding due process claims.").  This Court finds it hard to believe that the Supreme Court considers itself in *Nelson* to have resolved a long-running jurisprudential debate on the strength of a few sentences and a citation to a dissenting footnote.  In at least one later case the Supreme Court seems not to have regarded *Nelson* as establishing a general rule. *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 131 n.4 (2023) (Gorsuch, J., opinion) (calling for application of *Medina* to question of civil procedure without reference to *Nelson* or *Kaley*); *id.* at 175 n.3 (Barrett, J., dissenting) (also appealing to historic practice).

The problem, perhaps otherwise academic, matters here because the parties do not agree whether Indiana's civil forfeiture scheme is basically criminal or not. (*Compare* Pl.'s R. 28, ECF No. 133 ("Civil forfeitures in Indiana . . . are rooted in the state's criminal-justice apparatus.") *with* Defs.' Br. Supp. 4, ECF No. 128 (quoting *Katner v. State*, 655 N.E.2d 345, 347 (Ind. 1995)) ("Forfeiture actions . . . [are] properly classified as civil in nature.").)  Ironically, IFJ urges the Court to make a more or less disguised policy choice, while its "criminal" categorization would, under *Nelson*, call

for *Medina's* deference to history, and the State urges a historical approach, while its "civil" categorization would call for *Mathews*' policy balancing.   To add to the confusion, IFJ rejects the application of *Mathews* here, because, in its view, *Mathews* balancing applies when deciding "how much" process is due and not when deciding whether a given process is fair.  (Pl.'s R. 46, ECF No. 133.)

This Court, which must after all use some principle of decision, thinks it best to apply *Medina*.  The *Mallory* notes seem to indicate that the historical approach is in favor.  And if *Nelson* gives the rule, *Medina* is appropriate because Indiana's civil-forfeiture system is seen as "part of the criminal process," *Nelson*, 581 U.S. at 134—it resembles criminal procedure more than the novel administrative processes for which *Mathews'* test was developed, *cf. Medina*, 505 U.S. at 444 (noting *Mathews*' origin in administrative context and urging caution in expanding its scope); *Dusenbery*, 534 U.S. at 167 (declining to apply *Mathews* outside of administrative procedure context); *Kaley*, 571 U.S. at 334 (noting the argument for limiting *Mathews*).  Or if, as *Dusenbery* suggests, the Court is free to choose its own standard, *Medina* seems better suited to this Court's limited constitutional role: Indiana's law is the product of "considered legislative judgment," *Medina*, 505 U.S. at 443; the Court has no roving commission to interfere with that judgment, *id.*; and may not impose its "personal and private notions" on the people of Indiana, *Dowling v. United States*, 493 U.S. 342, 352–53 (1990) (quoting *Lovasco*, 431 U.S. at 790); *Spencer v. State of Tex.*, 385 U.S. 554, 564 (1967) (quoting *Snyder v. Commonwealth of Mass.*, 291 U.S. 97, 105 (1934) (Cardozo, J.), *overruled by Malloy v. Hogan*, 378 U.S. 1 (1964))

("[A] state rule of law 'does not run foul of the Fourteenth Amendment because another method may seem to our thinking to be fairer or wiser . . . .'").

Under *Medina*, a state law is not to be struck down unless it "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Medina*, 505 U.S. at 446 (quoting *Patterson*, 432 U.S. at 202). "Historical practice is probative of whether a procedural rule can be characterized as fundamental." *Id.*; *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996) ("Our primary guide in determining whether the principle in question is fundamental is, of course, historical practice."); *accord Haslip*, 499 U.S. at 36 (Scalia, J., concurring) (advocating for historic practice to be not merely probative but dispositive, yet observing that even under the weaker thesis "very few cases have used the Due Process Clause, without the benefit of an accompanying Bill of Rights guarantee, to strike down a procedure concededly approved by traditional and continuing American practice."). "Contemporary practice" may be considered but is "of limited relevance to the due process inquiry." *Medina*, 505 U.S. at 447 (citing *Martin*, 480 U.S. at 236 and *Patterson*, 432 U.S. at 211); *accord Mallory*, 600 U.S. at 140 n.7 (Gorsuch, J., opinion) (citing *Ownbey v. Morgan*, 256 U.S. 94, 110–11 (1921)) ("[T]he meaning of the Due Process Clause is not measured by the latest popularity poll").

### D. *Medina* Analysis

Any historical evaluation begins with what should be obvious: our modern legal system is neither the only possible nor necessarily the best. By corollary, to note that a present feature of the system was introduced as a "reform" is not to prove it better—

only that its supporters wanted it thought so.  And no amount of support, whether now or in the past, suffices to show that a given position is really better, and not merely believed better.

At present, there is a divide, widely believed fundamental, between "criminal" and "civil" actions.  The state has a monopoly on criminal prosecution, through the public prosecutor, who is expected or constrained selectively to enforce the law.  This selective enforcement is called "prosecutorial discretion," and it is protected by absolute immunity.  *Imbler v. Pachtman*, 424 U.S. 409, 427 (1976) ("[T]his immunity does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty.").  The prosecutor is paid a fixed salary independent of his or her success convicting criminals, and is exhorted to seek, not convictions, but justice.  *See* John D. Bessler, *Private Prosecution in America: Its Origins, History, and Unconstitutionality in the Twenty-first Century*, xxii (2022) (describing, and proffering as constitutionally ordained, the modern system).

Once, everything was different.  *See generally* Jonathan Barth, *Criminal Prosecution in American History: Private or Public*, 67 S.D. L. Rev. 119 (2022) (describing old system).  There was no definite line between criminal and civil actions.  *E.g.*, *Taylor v. United States*, 44 U.S. 197, 210 (1845) (Story, J.) (discussing ambivalence between "penal" and "remedial" classifications in a forfeiture case).  There was no public official responsible for charging crimes, and the office of "prosecutor," if it existed at all, was a legal advisor to the government or lead counsel

on especially important cases. There was no general belief that some guilty individuals best not be charged. There was no absolute immunity for prosecutors. *Kalina v. Fletcher*, 522 U.S. 118, 132 (1997) (Scalia, J., concurring) (identifying the distortions of 1871 common law created by the Supreme Court's post-*Imbler* "functional" immunity jurisprudence). Rewards were a common incentive for successful prosecutions. And there was no belief that the prosecutor (or informant) in a criminal case had any special duty to justice in the abstract, apart from his role as one side's advocate in an adversary system.

The Court has no role in the policy debate between the old system and the new. But it *is* a policy debate, which belongs to the people and their legislatures. Reasonable people can and have taken both sides: the old system prevailed for the first hundred years or so of this country's experience under the Constitution.[1] As the Court intimated in its overview, civil libertarians—people who shared IFJ's philosophic priors—once preferred it. *See* Barth at 151–52 (describing early

---

[1] Of course, what the Court refers to for convenience as the old "system" is in fact a collection of individual policies that were adopted or abandoned separately. And while the general landscape has changed—rather completely, as the secondary sources show—some individual policies survive. *Robertson v. United States ex rel. Watson*, 560 U.S. 272, 279 (2010) (Roberts, C.J., dissenting from dismissal of cert.) (noting continued viability of private prosecution in some states). Often it is precisely those survivals that are troublesome to modern theorists who neglect history. Thus, for instance, IFJ points the Court to recent disapprobation of *qui tam* actions as interfering with a supposed 'unitary executive' power, under Article II, to control all prosecutions. (Pl.'s R. 16, ECF No. 133 (citing *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 450 (2023) (Thomas, J., dissenting)).) But history shows that *qui tam* actions were routine at ratification and were never believed to overstep executive power. One could double down and say that the Founders misunderstood their own law, and that the historic practice is no guarantee of constitutionality, *Polansky,* 599 U.S. at 450, but the honest move, when presented with historic fact that does not fit one's theory, is to abandon the theory, not the fact. Perhaps, then, the Constitution does not require that the executive control all prosecutions, but that all prosecutions *entrusted to the government* must be executive and not legislative or judicial.

American resistance to exclusive public prosecutions and standing public police force); *see also* I. Bennett Capers, *Against Prosecutors*, 105 Cornell L. Rev. 1561 (2020) (contemporary argument from a self-identified "progressive criminal justice scholar" against exclusively public prosecution). To them, giving the state a monopoly over criminal enforcement was a dangerous innovation: it might allow, for instance, the politically well-connected to escape responsibility for their actions. It took from ordinary citizens their ability to seek redress at law. *Rehberg v. Paulk*, 566 U.S. 356, 364 (2012) (quoting *Stewart v. Sonneborn*, 98 U.S. 187, 198 (1879) (Bradley, J., dissenting)) ("[E]very man in the community, if he has probable cause for prosecuting another, has a perfect right, by law, to institute such prosecution . . . ."). And the idea of selective enforcement, which is habitual to modern observers, would have been asking for trouble: why allow the state to criminalize more behavior than it intended to suppress and then pick its targets at its sole discretion? *Compare* Robert H. Jackson, *The Federal Prosecutor*, Address Delivered at the Second Annual Conference of United States Attorneys, April 1, 1940 (acknowledging federal prosecutors' "dangerous power" but relying on "[a] sensitiveness to fair play and sportsmanship" as "perhaps the best protection" against its abuse) *with* Lauren M. Ouziel, *Prosecution in Public, Prosecution in Private*, 97 Notre Dame L. Rev. 1071, 1079–83 (2022) (analyzing shift from private to public prosecution as an escape from traditional procedural limits on enforcement power). That is hardly compatible with a government of laws not men. And so forth.

It might now be difficult to see how people once thought that way—apparently more difficult than the Court would like to think, if the rampant presentism it finds in certain academic sources is anything to go by—but that does not excuse the Court, or, it hopes, the Parties, from the effort of historical imagination. The Court's role demands humility. The past two hundred years have seen two diametrically different systems of criminal (and here, quasi-criminal) justice exist beneath the same constitutional regime, which accommodated both. Clearly the Constitution is roomy enough to allow for policies that do not fit with modern orthodoxy. The Court has taken some pains to indicate the historic irony here not to endorse one view or the other, and still less to provoke discomfiture, but simply to illustrate, as vividly as possible, that a policy dispute is not forever settled because one side has the ascendancy. The Court may not—and ought not—stop a fight that is not won. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) ("By extending constitutional protection to an asserted right or liberty interest, [the courts], to a great extent, place the matter outside the arena of public debate and legislative action.").

Finally, because *Medina* does not by its terms admit that historic practice is dispositive, the Court will observe that a contingency-fee prosecutor has some rational basis. That basis is just what the Supreme Court identified in *Marshall*: that the adversary system expects each party to be zealous in its own cause. It is "judges . . . whose impartiality serves as the ultimate guarantee of a fair and meaningful proceeding in our constitutional regime." *Marshall*, 446 U.S. at 250. Even the Supreme Court in *Berger*—whose observation that a public prosecutor's

interest "is not that it shall win a case, but that justice shall be done" gives the text for many a sermon on prosecutors' noble disinterestedness—concluded that "[i]t is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." 295 U.S. at 88. So, to argue that a prosecutor becomes too zealous when motivated by a contingent fee is to deny the basic premise of the adversary system. There is no correct level of motivation (are prosecutors supposed to be all equally blasé?) just as there is no correct level of skill—the idea is that each side will put its best foot forward and the neutral tribunal will find the truth.

Because IFJ cannot show that Indiana's use of contingency-fee private prosecutions "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental," its case fails and the law stands. *Medina*, 505 U.S. at 446 (quoting *Patterson*, 432 U.S. at 202).

### III.   Conclusion

Indiana's use of contingency-fee private prosecutors in civil forfeiture does not violate the Due Process clause. Thus, Plaintiff's Motion for Summary Judgment, (ECF No. 120), is **denied**, and Defendants' Cross-Motion for Summary Judgment, (ECF No. 126), is **granted**. The case is resolved and final judgment shall issue accordingly.

The Court wishes to be clear about the scope of its decision. It has not declared Indiana's civil forfeiture scheme constitutional *in toto*, only that the single aspect of it challenged here, the fee arrangement for prosecutors, is constitutional. And it has

not endorsed Indiana's policy, only observed that the policy choice is Indiana's to make.

**SO ORDERED.**

Date: 02/07/2024

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

J. Derek Atwood
INDIANA ATTORNEY GENERAL
derek.atwood@atg.in.gov

James A. Barta
Office of the Indiana Attorney General
james.barta@atg.in.gov

Cynthia A. Bedrick
MCNEELY LAW LLP
CBedrick@McNeelyLaw.com

Robert M. Belden
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Ste 900
Arlington, VA 22203

Katelyn E. Doering
Office of IN Attorney General
katelyn.doering@atg.in.gov

Samuel B. Gedge
Institute for Justice
sgedge@ij.org

Michael N. Greensburg
INSTITUTE FOR JUSTICE
901 N. Glebe Rd, Ste 900
Arlington, VA 22203

Jill Gagnon Haddad
INDIANA ATTORNEY GENERAL
jill.haddad@atg.in.gov

Melinda Rebecca Holmes
INDIANA ATTORNEY GENERAL
melinda.holmes@atg.in.gov

J. Lee McNeely
McNeely Law LLP
LMcNeely@McNeelyLaw.com

Scott Aaron Milkey
MCNEELYLAW LLP
SMilkey@McNeelyLaw.com

William N. Riley
RileyCate, LLC
wriley@rileycate.com

Anthony B. Sanders
Institute for Justice
asanders@ij.org

Sundeep Singh
RileyCate LLC
ssingh@rileycate.com